IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 07-cv-01985-WYD-MJW

ZEILER FARMS, INC.,

     Plaintiff,

v.

ANADARKO E & P COMPANY LP f/k/a
RME PETROLEUM COMPANY,
ANADARKO LAND COMPANY f/k/a
RME LAND CORP., and
UNIOIL, INC.,

     Defendants.

## ORDER

THIS MATTER comes before me following a trial to the Court on April 19 and 20, 2010. The parties agreed there was one issue on which I should render declaratory judgement, namely:

> Would it be a breach of the Surface Owner's Agreement between Zeiler Farms and Champlin Petroleum Company (a predecessor of the Anadarko Parties) for Unioil to drill additional vertical wells on the Southwest Quarter Section of the Zeiler Farms Property rather than to drill such additional wells directionally?

Having heard all of the evidence, reviewed the parties' pleadings and arguments, and being fully advised herein, I answer the issue presented by the parties in the negative; I do not find it to be a breach of the Surface Owner's Agreement for Unioil to drill additional vertical wells rather than to drill such additional wells directionally.

**I.     FINDINGS OF FACT[1]**

The dispute here involves a 147-acre parcel of land that occupies most of a governmental quarter section described as Township 5 North, Range 67 West, 6th P.M., Section 7: SW/4, in Weld County, Colorado.  The entire fee simple interest in this land was originally patented by the United States to Union Pacific Railroad Company ("Union Pacific") on April 28, 1903, under the Union Pacific Charter Act, as amended on July 2, 1864.  By Warranty Deed, dated June 14, 1906, Union Pacific conveyed only the surface estate in the NW/4 and S/2 of Section 7 to Lee J. Kelim (the "1906 Deed").  Union Pacific reserved for itself, its successors and assigns the mineral estate and rights to surface use to develop the minerals.

Members of the Zeiler family acquired the surface estate in Section 7 by deed dated March 20, 1972.  During the period of Zeiler Farms' ownership of the surface of the property up to and including the present day, Zeiler Farms has grown crops on the surface of the SW/4 of Section 7.  There has never been a structure on this property other than oil and gas wells and tank batteries.  The officers and shareholders of Zeiler Farms include Kathleen Weinmeister, Richard Zeiler, and Conrad K. ("Ken") Zeiler.  All are experienced business people.

The minerals under the S/2 of Section 7 are owned by Defendants Anadarko E&P Company LP f/k/a RME Petroleum Company and Anadarko Land Company f/k/a RME Land Corp. (collectively, the "Anadarko Defendants"). The minerals were so reserved,

---

[1]The parties have stipulated to the admissibility and authenticity of most of the material foundational facts, including: the 1906 Deed; the Surface Owner's Agreement; the Lease; sections 16-6-60 to 16-6-90, 16-11-50 to 16-11-100 of the Town of Windsor municipal code; and the "COGIS-Facility Query Results".  I also incorporate by reference as if set forth herein the undisputed facts advanced by the parties.

along with surface easements, in a deed dated 1906, conveying the surface of the land to Plaintiff's predecessor in title. These minerals and surface rights are leased by the Anadarko Defendants under the lease dated December 23, 1970 (the "Lease"). Defendant Unioil, Inc. ("Unioil") is the lessee for the SW/4 of Section 7.

On September 23, 1983, a predecessor of the Anadarko Defendants entered into a Surface Owner's Agreement with Zeiler Farms (the "SOA"), which defines the rights of the Anadarko Defendants and their lessees to use the surface of the land for oil and gas operations. The Surface Owner's Agreement covers the quarter section of land at issue (SW/4) as well as an adjacent quarter section of land (SE/4).

The provisions of the SOA relevant to this litigation are:

Recitals, final paragraph:

> Besides confirming the surface uses expressly set forth below, this agreement is intended to avoid and resolve any and all disputes of whatever nature in connection with the ownership of oil, gas and associated liquid hydrocarbon substances in the described premises, including rights to extract, remove or market such minerals, and including any such dispute that may arise hereafter, whether or not the basis for such dispute is now known or has been identified in disputes involving exceptions and reservations of minerals in other deeds from Union Pacific Railroad Company or its predecessors.

Section 1:

> . . . Land Owner hereby confirms, extends and grants to Champlin, its agents, lessees, licensees, successors and assigns . . . and their respective successors and assigns, the easements and rights to enter upon the described premises and to extract, remove, store, transport, and market for its or their account oil, gas, and associated liquid hydrocarbon substances, and to drill, construct, maintain and use upon, within, and over said premises all oil wells, gas wells, derricks, machinery, tanks, drips, boilers, engines, pipe, power and telephone lines, roadways, water wells, and without limitation by reason of the foregoing enumeration, any and all other structures, equipment, fixtures, appurtenances, or facilities (all the above being included

3

under the term "facilities") necessary or convenient in prospecting and developing for, producing, storing, transporting, and marketing oil, gas, and associated liquid hydrocarbon substances under or produced from any portion of the described premises . . . together with the right to remove said facilities and the right to use such water as may be needed from the described premises, not including water from Land Owner's wells.

Section 2:

Champlin agrees, so long as it is receiving oil and/or gas production from or oil and/or gas royalties upon production from the described premises . . . to pay or cause to be paid to the Land Owner in cash the value on the premises of two and one-half percent (2-1/2%) of all the oil and gas and associated liquid hydrocarbons hereafter produced, saved, and marketed therefrom . . .

Prior to the date on which this litigation began, several wells were drilled on the Zeiler Farms surface under the terms of the SOA. These wells are: the Gove #1 in 1983; the Zeiler 9-7 in 2005; and the Zeiler 10-7, Zeiler 15-7, and Zeiler 16-7, all in 2006. A vertical well, the Gove #1 was completed by Unioil in December 1983 and continues to produce natural gas currently. A vertical well, the Zeiler 9-7 was completed in May 2005 and continues to produce natural gas currently.

The Zeiler 10-7, Zeiler 15-7, and Zeiler 16-7, were drilled directionally in the SE/4 of Section 7 by Kerr-McGee Oil & Gas Onshore LP ("Kerr-McGee") in May and June, 2006. These wells were also subject to the SOA at issue in this case. Zeiler Farms initially requested that Kerr-McGee drill these three wells directionally. After Kerr-McGee refused that request, Zeiler Farms entered into an agreement (May 2006 Agreement) to pay the difference in cost between directional drilling and vertical drilling for these wells, which totaled $100,000 per well. Conrad Zeiler stated that he did not believe a valid legal basis existed to prevent Kerr-McGee from drilling vertically. Kathleen Weinmeister, the president

4

of Zeiler Farms, testified that she regretted signing the SOA because, as she stated in a September 27, 2005 letter, the oil and gas operator in Section 7 "seems to have the right to do as they damn well please." From January 2006 through July 2008, Zeiler Farms received approximately $425,000 under Section 2 of the SOA as a 2-1/2% production payment from the oil and gas produced by the five existing wells on the S/2 of Section 7.

Unioil proposes to drill four more wells in the SW/4 of Section 7 (the "Future Wells"). The Future Wells have been permitted as vertical wells by the Colorado Oil and Gas Conservation Commission (the "COGCC") at four locations at the center of each quarter/quarter section of the SW/4 of Section 7. Zeiler Farms has demanded that Unioil drill the Future Wells at Unioil's sole cost as directional wells rather than vertical wells. Unioil has declined this demand, but has offered to drill the Future Wells directionally, as requested, if Zeiler Farms will pay the incremental cost of directional drilling. Unioil even offered to advance the cost of directionally drilling to Zeiler Farms and only collect repayment from the 2-1/2% production payment from the oil and gas so produced. Zeiler Farms declined this offer.

If the Future Wells are drilled directionally, the surface area occupied by the wells would be less than that associated with the drilling of vertical wells. Vertical wells were used to extract oil and gas when the 1906 Deed was executed, when the Exploration Agreement was signed in 1969, when the Lease was signed in 1970, and when the SOA was signed in 1983. Directional drilling of oil and gas wells was unknown in 1906. Directional drilling was not typical or common in 1983 in the Wattenberg Field or other onshore fields. Today, directional drilling is more common, but it is still not a typical or standard approach. Compared to directional drilling, vertical drilling is less costly, less

5

risky, and a more common form of drilling.  Vertical drilling is more convenient to an operator than directional drilling because there are less mechanical problems, less capital investment and it results in a straighter hole.  The difference in cost between vertical and directional drilling varies by individual wells.  In 2007, the Colorado Legislature determined that $87,500 is an appropriate amount to use as a default for the increased cost per well for directional drilling when the oil and gas operator and surface owner do not agree upon an amount.  *See* Colo. Rev. Stat. § 24-65.5-103.7(1)(a).

**II.    LEGAL STANDARD**

In order for a court to issue a declaratory judgment, the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests.  It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (citations omitted).  In light of that standard, in this case it is appropriate to entertain and adjudicate Zeiler Farms' claim for a declaratory judgment because a declaratory judgment would settle the controversy between the parties as to the stipulated issue stated above and, as stated in my Order dated September 4, 2009 [d/e 78], would serve a useful purpose in clarifying the legal relations at issue, by determining the parties' rights under the Surface Owner's Agreement before Defendant Unioil commences drilling.  *See also Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1248 (10th Cir. 2008).

"The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009).  In determining the parties' reasonable expectations and

intent, "the court should give effect to the plain and generally accepted meaning of the contractual language." *Id.* "When determining the plain and ordinary meaning of words, definitions in a recognized dictionary may be considered." *Hecla Mining Co. v New Hampshire Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991). The Oxford English Dictionary defines "necessary" as "[i]ndispensable, vital, essential; requisite." *Oxford English Dictionary Online* (2010). The word "convenient" means "suitable (to or for a purpose, the circumstances, etc.); appropriate, due" and "well-adapted to one's purpose or situation; available . . . trouble-free." Oxford English Dictionary (Shorter 5th ed. 2002).

"The court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Copper Mountain, Inc.*, 208 P.3d at 697 (internal quotation marks omitted).
The court should ascertain the meaning of the contract by examining "the entire instrument and not by viewing clauses or phrases in isolation." *U.S. Fidelity & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992).

The provisions of a written agreement are not ambiguous unless they are susceptible to more than one reasonable interpretation. *Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 912 (Colo. 1996). However, the fact that the parties may have different opinions about the meaning of a provision does not itself mean that the provision is ambiguous. *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 256-57 (1978). A court "will not torture words and phrases to create an ambiguity where the ordinary meaning of the words leaves no room for ambiguity." *Hudgeons v. Tenneco Oil Co.*, 796 P.2d 21, 22 (Colo. App. 1990).

When a contract has been given practical construction, as reflected by the conduct

and acts of the parties in its performance, such construction should be considered by the court in ascertaining the mutual meaning of the parties at the time of contracting. *Nahring v. City and County of Denver*, 484 P.2d 1235, 1237 (Colo. 1971). "The parties' construction of a contract before a dispute arises is a particularly persuasive aid in determining the true meaning of the agreement." *See, e.g., Concerning Application for Water Rights of Town of Estes Park v. N. Colo. Water Conservancy Dist.*, 677 P.2d 320, 327-28 (Colo. 1984) (Town's failure to assert a right to credit for contract water return flows for 22 years confirms court's interpretation of unambiguous agreement).

## III. LEGAL ANALYSIS

Looking to the plain language, the Surface Owner's Agreement, much like the 1906 Deed, is not ambiguous. The pertinent provision of the SOA is set forth above and, despite the Plaintiff's strained interpretation, the intent of the parties is readily apparent from the express language of the agreement. First, the SOA expressly identifies the reason the parties entered into the SOA - to reduce to writing and "confirm" the oil companies' rights to use the physical surface of the property. *See* SOA, p. 2 (dual purpose of SOA was to "confirm[ ] the surface use" and avoid and resolve all disputes related to extracting minerals.) The SOA further provides that Zeiler Farms "confirms", "extends" and "grants" an easement and certain rights to Anadarko and Unioil.[2] These rights are exceedingly broad in scope and include the right to "drill" and "construct ... all oil wells [and] gas wells" that are "necessary or convenient in prospecting [ ] developing [and] producing [ ] oil [ ] and gas[.]" *Id.* at p. 3. The intent of the parties is clear and unambiguous from this language -

---

[2] I have substituted the names from the SOA, "landowner", "Champlin" and Champlin's "lessees", with the names of the parties for convenience of the analysis.

Zeiler Farms granted Anadarko the right to drill and construct *all* wells necessary or convenient to producing oil and gas from the Zeiler Farms property.

Despite the clear, straightforward language employed in the SOA, and despite (or in spite of) the parties' declaration that the SOA was meant to resolve disputes such as this, Plaintiff attempts to argue that this language is ambiguous because the SOA "does not say from whose perspective the word convenient is relative." *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, ¶26. Plaintiff argues that the word convenient is meant to be viewed from the perspective of the surface owner. *Id.* I disagree. There is absolutely no reasonable basis whatsoever to read the SOA in the manner advanced by Plaintiff. There is simply no ambiguity about *who* is being granted the right to do what is necessary or convenient in the production of minerals - the Anadarko Defendants. Plaintiff's attempt to argue otherwise is not supported by any reasonable interpretation of the SOA. *Hudgeons*, 796 P.2d at 22 (a court will not torture words and phrases to create an ambiguity where the ordinary meaning of the words leaves no room for ambiguity).

My interpretation of the SOA, however, does not end the inquiry here. Although this is not a case involving surface rights under an implied easement or the accommodation doctrine,[3] the question still remains whether the act of drilling the wells vertically will exceed the scope of the easements and rights granted to the Anadarko Defendants under the SOA. *See* Howard R. Williams & Charles J. Meyers, Oil and Gas Law § 218.7, 218.8 (2009). Or, stated differently, whether drilling the wells vertically is unnecessary or inconvenient. On this point the evidence is undisputed and overwhelmingly favors the

---

[3] I previously determined that the terms of the Surface Owner's Agreement, rather than the accommodation doctrine codified in C.R.S. § 34-60-127, provide the standard for Defendant Unioil's use of the surface estate in connection with its proposed construction of four vertical drilling wells. *See* Order dated March 31, 2009 [d/e 72].

Defendants. The testimony of the witnesses established that vertical drilling is less risky and less expensive than directional drilling, and that vertical drilling is the customary, prevalent and traditional manner for drilling a well. The defense witness, Mr. James Wason, testified that it would be more convenient for Defendants to drill vertically. Even Plaintiff's own expert, Mr. Arthur Ronald Briggs, did not deny that it would be convenient for Defendants to drill vertically. Moreover, the Colorado Oil and Gas Conservation Commission has permitted the Future Wells to be drilled vertically. Accordingly, I find that drilling these wells vertically is both necessary and convenient under the SOA and not in excess of the rights granted to the Defendants under that document.

One other point is worth mentioning here. Even though I find the SOA readily unambiguous, had I deemed it necessary to evaluate the conduct of the parties to aid in the interpretation of the agreement, the Zeilers' past behavior belies the arguments they advance in this proceeding. *Nahring*, 484 P.2d at 1237. Ms. Weinmeister's communications reflect her belief that the Defendants have the right to drill vertically. Mr. Zeiler further indicated that Plaintiff had no legal basis to resist vertical drilling. But the most compelling evidence that dooms the Plaintiffs' argument here are their actions with respect to Kerr-McGee. In that situation Plaintiffs paid substantial sums of money so that the wells would be drilled directionally rather than vertically under the same SOA at issue here. It is unimaginable that sophisticated parties such as the Zeilers would pay $300,000 to have directional drilling performed if they believed they had the legal right to require directional drilling under the SOA. I also find no support for Plaintiffs' suggestion that they were somehow coerced into the paying Kerr-McGee for directional drilling. To claim now that they entered into such an agreement as a result of coercion is nothing more than a

unfounded attempt to evade the obvious implications of their actions. The Plaintiffs had no right to demand directionally drilling from Kerr-McGee and they have no right to demand directional drilling from the Anadarko Defendants.[4]

## IV. CONCLUSION

Accordingly, it is

ORDERED that the following declaratory judgment is hereby entered in favor of the Defendants: It is not a breach of the Surface Owner's Agreement between Zeiler Farms and Champlin Petroleum Company for Defendants to drill additional vertical wells on the Southwest Quarter Section of the Zeiler Farms Property rather than to drill such additional wells directionally.

Dated this 1st day of July, 2010.

BY THE COURT:

s/ Wiley Y. Daniel
WILEY Y. DANIEL,
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] Plaintiff relies heavily upon section 4.10 of the Restatement (Third) of Property, Servitudes and cases citing the Restatement (Third) in support of their claim to relief here. I find no basis to apply the Restatement (Third) in this case. *See Amoco Prod. Co. v. Thunderhead Investments, Inc.*, 235 F. Supp.2d 1163, 1171-72 (D. Colo. 2002)(expressly rejected application of the Restatement (Third) in the oil and gas context); *see also* Restatement (Third) Of Property, Servitudes § 1.1 cmt. e (2000). Further, the sections relied upon by Plaintiff do not authorize me to limit the express easement created by the Surface Owner's Agreement for oil and gas development.